IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No. |
| | ) | 16-00290-01-CR-W-DGK |
| JEFFREY T. ARZOLA, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION TO
DENY DEFENDANT'S MOTION TO SUPPRESS**

Before the Court is Defendant's Motion to Suppress Evidence. Defendant moves the Court to suppress evidence seized as a result of his September 1, 2016 arrest. For the following reasons, Defendant's motion should be denied.

## I. BACKGROUND

An indictment was returned on September 20, 2016, charging Defendant with one count of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Defendant filed a motion to suppress (Doc. No. 27) and the government responded (Doc. No. 30). An evidentiary hearing was then held. The government appeared by Assistant United States Attorney Mike Green. Defendant was present, represented by appointed counsel Bill Raymond. The government called the following witnesses to testify: (1) Grandview, Missouri Police Department Detective Paul Brooks; (2) Kansas City, Missouri Police Department Sergeant Brad Dumit; (3) Kansas City, Missouri Police Department Detective Greg Harmon; and (4) Kansas City, Missouri Police Department Detective William Hooley. The following exhibits were admitted into evidence:

| | |
|---|---|
| Government's Exhibit 1: | Dash cam video; |
| Government's Exhibit 2: | Video of statements from William Edwards and Jeffrey Arzola; and |
| Government's Exhibit 3: | Miranda waiver. |

## II. EVIDENCE

On the basis of the evidence presented at the suppression hearing, I submit the following findings of fact.

1. Kansas City, Missouri Police Department Detective William Hooley is a member of the Vice Squad (Tr. at 4). Detective Hooley's work with the Vice Squad includes undercover operations related to sex trafficking, prostitution and narcotics (Tr. at 4-5). When involved in undercover prostitution investigations, Detective Hooley generally plays the role of a customer (Tr. at 5).

2. On September 1, 2016, Detective Hooley was assisting the FBI with an investigation that pertained to the use of an underage girl in human trafficking (Tr. at 4, 8, 19). Detective Hooley obtained a telephone number from an advertisement on Backpage.com, called the number and spoke to a female whose real name he later learned to be Nicole Lewis (Tr. at 8-9, 22).

3. Detective Hooley spoke to Ms. Lewis at least four or five times that day to coordinate details of the transaction; he never spoke to anyone but Ms. Lewis (Tr. at 9, 23). They agreed Detective Hooley would meet Ms. Lewis for "full-service" in exchange for $200 (Tr. at 9, 23). The discussions always involved sex with Ms. Lewis, not with a minor (Tr. at 23-24).

4. Because the meeting location was going to be in Grandview, Missouri, Detective Hooley's team enlisted the assistance of the Grandview Police Department (Tr. at 10). All law

enforcement officers involved in the operation met for a briefing in the parking lot of a high school beforehand (Tr. at 10, 24-25). The Grandview officers were familiar with the residence involved, and told Detective Hooley during the briefing that he was going into a bad place that was known for prostitution, drugs, and that usually had a lot of people there (Tr. at 11, 25, 32). Law enforcement frequently received calls for service regarding the residence (Tr. at 51).

5. When Detective Hooley arrived at the residence, he parked across the street (Tr. at 12). An unhappy neighbor came outside, told Detective Hooley he was not a nice person to go there and repeatedly told him to move his car (Tr. at 12-13, 26). Detective Hooley did so and walked up to the residence where Ms. Lewis was standing in the doorway (Tr. at 13).

6. Ms. Lewis let Detective Hooley inside the residence; it was a very dark, split-entry house (Tr. at 13, 14). A neon clock in the front room was the only light Detective Hooley could see (Tr. at 13-14). Detective Hooley was not aware if anyone else was in the house (Tr. at 26-27).

7. Ms. Lewis led Detective Hooley up the stairs and down a hallway to a bedroom (Tr. at 14, 27). They discussed the deal, then Detective Hooley took out the money and told Ms. Lewis he needed to use the restroom (Tr. at 14). Detective Hooley stepped into the bathroom and gave the take-down signal, alerting the supporting officers to come in and extract him (Tr. at 15, 27-28). There was soon a loud, banging sound at the front door (Tr. at 15, 28).

8. Detective Hooley then heard a sliding metal sound (Tr. at 15). He cracked the bathroom door, looked outside and saw Ms. Lewis holding a knife in her bedroom (Tr. at 15). Detective Hooley asked Ms. Lewis why she had a knife and asked her to put it down (Tr. at 15-16). Detective Hooley narrated these events as they transpired so the supporting officers would know Ms. Lewis had a knife (Tr. at 15-16). Ms. Lewis put the knife down and told

3

Detective Hooley there were police at the door (Tr. at 16). Detective Hooley responded he thought it was, instead, the neighbor who had angrily confronted him when he arrived and said he would go handle it (Tr. at 16). Detective Hooley ultimately went to the front door and grabbed the deadbolt to open it (Tr. at 16-17). Ms. Lewis told Detective Hooley she would kill him if he opened the door and jumped onto Detective Hooley's back (Tr. at 17, 29, 36).

9. Detective Hooley got the door open and several Grandview police officers came in (Tr. at 17). Detective Hooley was removed from the house and Ms. Lewis was taken into custody (Tr. at 18, 29).

10. The officers could hear movement in the basement (Tr. at 36-37). They cleared the house and went downstairs (Tr. at 37). There, they found three men; one man appeared to be renting one room and the other two appeared to be renting a second room (Tr. at 37, 43). The officers observed drug paraphernalia (Tr. at 37, 43-44).

11. After securing the house, Sergeant Dumit and others went outside and congregated in the driveway to discuss the plan moving forward (Tr. at 38, 44). While doing so, Sergeant Dumit observed a female appear from the side of the garage (Tr. at 38). The officers asked her where she came from and the female pointed back toward the garage (Tr. at 38, 44).

12. At the same time, Grandview, Missouri Police Department Sergeant Martin Studdard, who was standing in the front yard of the residence, observed the garage door close as the female exited the garage (Tr. at 52-53). He did not see anything inside the garage (Tr. at 69).

13. Although the garage was attached to the house, there was not a door that led from inside the house directly into the garage (Tr. at 38, 45, 47, 64).

14. Sergeant Dumit sent another officer to the garage to look for an open area because the garage itself was closed (Tr. at 38). Sergeant Dumit and Detective Harmon went around the back side of the house where they found a door and could hear people inside the garage (Tr. at 38-39, 48, 54). They pushed the door open and observed three males inside the garage (Tr. at 39, 45-46, 48). The men were working on items in the garage and appeared very nervous (Tr. at 39-40, 46).

15. The officers observed an open duffle bag on the floor with what appeared to be controlled substances at the top of the bag (Tr. at 40, 57).

16. One of the detectives opened the garage door and Grandview police officers came inside (Tr. at 40). The officers sat the three men on the driveway in front of the garage until they could determine their identity (Tr. at 40, 47, 54). The men were not handcuffed or searched (Tr. at 40-41). One of these men was William Scott Edwards (a resident of the house), and another was Defendant (Tr. at 54-55).

17. Sergeant Studdard was familiar with Defendant from prior encounters (Tr. at 55-56). Most of the encounters were criminal in nature, either relating to drugs or where Defendant would resist officers and fight during the course of an arrest (Tr. at 56).

18. Law enforcement eventually asked Defendant to stand up (Tr. at 57). Defendant complied but appeared very nervous and agitated (Tr. at 57). Defendant started looking to the right, which would have been an avenue of escape (Tr. at 57-58). Sergeant Studdard observed Defendant start pulling up his pants and noticed his breathing becoming more rapid (Tr. at 58, 67). Based on his experience as a police officer and previous dealings with Defendant, Sergeant Studdard believed Defendant was getting ready to either fight or flee (Tr. at 58, 67). Defendant did not physically move or actually try to flee (Tr. at 68).

19. Sergeant Studdard turned Defendant around, told Defendant to put his hands behind his back and placed Defendant in handcuffs (Tr. at 58). Sergeant Studdard did not advise Defendant of his <u>Miranda</u> rights (Tr. at 66). Sergeant Studdard then asked Defendant if he had any weapons or anything that was going to poke, prod or hurt him (Tr. at 58, 66). Defendant responded that he had a needle in his front pocket (Tr. at 58, 66).

20. Sergeant Studdard patted Defendant down and felt what appeared to be a needle and glass pipe in his right front pocket; he did not feel any weapons (Tr. at 59, 66-67). Sergeant Studdard instructed Grandview Police put him in Officer Breault's patrol vehicle (Tr. at 59-60, 69).

21. Officer Breault also did a pat-down search of Defendant and found additional needles and a spoon with residue on it (Tr. at 60). Defendant was placed under arrest for the possession of a controlled substance and drug paraphernalia and placed in the back of a patrol vehicle (Tr. at 60-61).

22. Mr. Edwards was arrested for a violation of a full order of protection and also placed in the back of a patrol vehicle (Tr. at 61). Due to a lack of manpower and available vehicles on the scene, both Defendant and Mr. Edwards were placed in the same vehicle (Tr. at 61). Sergeant Studdard activated the in-car patrol video and audio recording equipment and instructed Officer Breault to transport them to the Grandview Police Station (Tr. at 61-62). Sergeant Studdard testified he activated the recording equipment because there were two prisoners in the same vehicle, which was not typical (Tr. at 69). He wanted to make sure to capture anything that might happen with two individuals in a confined space together, and to capture any conversations they had and make sure they did not get into a fight (Tr. at 69-70).

23. The recording captured a conversation between Defendant and Mr. Edwards in

which Defendant attempted to get Mr. Edwards to take a handgun from him (Tr. at 74; Gvt. Exh. 1). Mr. Edwards declined and shoved the gun under a seat (Tr. at 74; Gvt. Exh. 1).

24. On September 2, 2016, the next morning, the handgun was found in the back of Officer Breault's patrol vehicle (Tr. at 62). Missouri Police Department Detective Paul Brooks was notified that the gun had been found under the driver's side rear seat (Tr. at 72-73). Detective Brooks recovered and reviewed the recording from Officer Breault's patrol car that captured Defendant and Mr. Edwards in the back seat (Tr. at 73, 76; Gvt. Exh. 1).

25. Detective Brooks interviewed Mr. Edwards (Tr. at 74; Gvt. Exh. 2). Mr. Edwards stated Defendant had the handgun on him and slid it over to Mr. Edwards (Tr. at 74). Mr. Edwards declined to take possession of the gun because he had a full order of protection against him and could not possess a gun and, instead, shoved it under the seat (Tr. at 74).

26. Detective Brooks also interviewed Defendant (Tr. at 74, 77; Gvt. Exh. 2). Defendant waived his <u>Miranda</u> rights and agreed to the interview (Tr. at 75, 77-78; Gvt. Exhs. 2, 3).

### III. LEGAL ANALYSIS

Defendant seeks suppression of (1) the gun found in back of the patrol vehicle; (2) the two syringes, glass pipe, spoon, small glass container of methamphetamine seized from Defendant's pockets during the pat down; (3) the backpack found in the garage; and (4) Defendant's video recorded statement to Detective Brooks. He argues that the search of the garage and search of his pockets were constitutionally impermissible and that the firearm retrieved from Officer Breault's patrol vehicle and September 2, 2016 <u>Mirandized</u> statement to Detective Brooks be excluded as fruit of the poisonous tree. He further seeks suppression of any statements made on September 1, 2016, on grounds of a Fifth Amendment violation. These

arguments must fail.

The search of the garage was a lawful protective sweep. Law enforcement are authorized to conduct a protective sweep of "'spaces immediately adjoining the place of an arrest from which an attack could be immediately launched' without first securing a search warrant." United States v. Davis, 471 F.3d 938, 944 (8th Cir. 2006)(quoting Maryland v. Buie, 494 U.S. 325, 334 (1990)). A protective sweep of a space not immediately adjoining the place of arrest must be supported by "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." Id. "A protective sweep may be executed after an arrest if there is a reasonable possibility that other persons may be present on the premises who pose a danger to the officers." Id.

In this case, law enforcement involved with the undercover human trafficking operation were aware that the residence to which they were reporting was known for prostitution, drugs and usually had a lot of people there. The Grandview Police Department frequently received calls for service regarding the residence. During the course of the operation, officers learned Ms. Lewis had a knife; they also observed drug paraphernalia in the basement. While in the driveway following Ms. Lewis' arrest, officers observed a female exit the garage as the garage door closed. Sergeant Dumit and Detective Harmon went to the back of the house and could hear individuals inside the garage. These facts would have led a reasonable officer to conclude that a legitimate threat to their safety could be inside the garage.

Once inside, officers observed an open duffle bag on the floor with what appeared to be controlled substances inside. Seizure of the backpack was thus justified under the plain view doctrine. United States v. Evans, 830 F.3d 761, 766 (8th Cir. 2016)("The plain view doctrine

8

permits the warrantless seizure of evidence if the officers 'are lawfully in a position from which they view the object, the incriminating character of the object is immediately apparent, and the officers have a lawful right to the object.'").

Observation of the controlled substances in the backpack also gave officers reasonable suspicion to temporarily detain Defendant. United States v. Morgan, 729 F.3d 1086, 1089 (8th Cir. 2013)(quoting United States v. Sokolow, 490 U.S. 1, 7 (1989))("A law enforcement officer may detain a person for investigation without probable cause to arrest when the officer has 'reasonable suspicion supported by articulable facts that criminal activity "may be afoot."'"). Officers then sat Defendant on the driveway in front of the garage. Sergeant Studdard was familiar with Defendant from prior encounters, most of which related to drugs or involved Defendant resisting and fighting during the course of an arrest. When officers asked Defendant to stand up, Defendant appeared very nervous and agitated. Sergeant Studdard noticed Defendant's breathing became more rapid and he observed Defendant start to pull up his pants and look to the right, which would have been an avenue of escape. Sergeant Studdard's experience and previous encounters with Defendant let him to believe Defendant was going to fight or flee. The totality of these circumstances constituted the requisite reasonable suspicion for a protective frisk. See United States v. Cash, 378 F.3d 745, 748 (8th Cir. 2004) (holding nervousness and furtiveness established reasonable suspicion for a Terry stop and frisk). Additionally, the public safety exception allowed Sergeant Studdard to ask Defendant prior to conducting the frisk whether there was anything that was going to "poke, prod or hurt him" without first Mirandizing Defendant. United States v. Liddell, 517 F.3d 1007, 1009 (8th Cir. 2008); United States v. Randolph, Case No. 14-00204-01-CR-W-BP, 2015 WL 6775928 at *4 (W.D. Mo. Nov. 5, 2015). Needles, a glass pipe, and a spoon with residue on it were found during the protective frisk. The "plain touch" or

"plain feel" doctrine authorized seizure of these items. United States v. Bustos-Torres, 396 F.3d 935, 944-45 (8th Cir. 2005).

Defendant was arrested for possession of a controlled substance and drug paraphernalia and placed in Officer Breault's patrol vehicle. Due to a lack of manpower and available vehicles, Defendant and Mr. Edwards, who had been arrested for a violation of a full order of protection, were placed in the same vehicle. Sergeant Studdard then activated the in-car patrol video and autio recording equipment. Sergeant Studdard testified he did so because there were two prisoners in the same vehicle and he wanted to capture anything that may transpire with the two men in a confined space together. The recording captured the conversation between Defendant and Mr. Edwards and Mr. Edwards ultimately shoving the gun under the seat.

In United States v. Hernandez-Mendoza, the Eighth Circuit held:

> [The trooper's] act of leaving the appellants alone in his vehicle, with a recording device activated, was not the functional equivalent of express questioning. [The trooper] may have expected that the two men would talk to each other if left alone, but an expectation of voluntary statements does not amount to deliberate elicitation of an incriminating response. "Officers to not interrogate a suspect simply by hoping that he will incriminate himself." Arizona v. Mauro, 481 U.S. 520, 529 (1987). [The trooper] did not question the suspects or engage in psychological ploys of the sort characterized as interrogation by the Supreme Court in Innis. See 446 U.S. at 299. He had legitimate security reasons for recording the sights and sounds within in vehicle, see Mauro, 481 U.S. at 528, and the appellants had no reasonable expectation of privacy in a marked patrol car, which is "owned and operated by the state for the express purpose of ferreting out crime." United States v. Clark, 22 F.3d 799, 801 (8th Cir. 1994).

600 F.3d 971, 977 (8th Cir. 2010). See also United States v. Townsend, Case No. 15-CR-0305 (SRN/HB), 2016 WL 1411273 at *2 (D. Minn. Mar. 23, 2016); United States v. Bailey, No. 14-CR-270 (PJS/TNL), 2015 WL 317372 at *5 (D. Minn. Jan 26, 2015); United States v. Combs, No. 4:13CR391 JAR, 2014 WL 12677771 at *3-*4 (E.D. Mo. Mar. 17, 2014); United States v. Cavan, No. 06-92(1) & (2) (DWF/AJB), 2006 WL 1662719 at *4 (D. Minn. June 12, 2006). Like

the Court in Hernandez-Mendoza, I find that Sergeant Studdard placing Defendant and Mr. Edwards in the same patrol vehicle and activating the recording equipment does not constitute an interrogation. Sergeant Studdard had a legitimate reason to do so given the resources available at the scene and the concerns posed by having two prisoners alone in the back seat together. I also find that Defendant lacked a reasonable expectation of privacy in the patrol vehicle.

Due to the lack of constitutional violations, neither the gun[1] found in Officer Breault's patrol vehicle nor Defendant's September 2, 2016 Mirandized statement to Detective Brooks constitute fruit of the poisonous tree.

### IV. CONCLUSION

For the above-stated reasons, it is

RECOMMENDED that the Court, after making an independent review of the record and the applicable law, enter an order denying Defendant's motion to suppress.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has fourteen days from the date of this report and recommendation to file and serve specific objections to the same, unless an extension of time for good cause is obtained. Failure to file and serve timely specific objections may result in waiver of the right to appeal factual findings made in the report and recommendation which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

*/s/ Robert E. Larsen*
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
August 31, 2017

---

[1] I also find that Defendant abandoned the gun; therefore, the Fourth Amendment was not implicated by its seizure. See United States v. Tugwell, 125 F.3d 600, 602 (8th Cir. 1997).